**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-75-RDM** |
| **MATTHEW RYAN MILLER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Miller to 51 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

### I.      INTRODUCTION

Defendant Matthew Miller violently participated in the January 6, 2021 attack on the United States Capitol building that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, including members of the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD"), and resulted in more than 2.7 million dollars' in losses[1] Miller directly contributed to the violence and damage unleashed on January 6, 2021.

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

After watching other rioters repeatedly assaulting law enforcement officers in the Lower West Terrance entrance to the Capitol – a scene that horrified people around the world – Miller chose to join in by encouraging rioters to push against the police lines erected to keep a violent and hostile mob from entering, and then unleashing the contents of a fire extinguisher directly onto officers in the Lower West Terrace tunnel.

The government recommends that the Court sentence Miller to 51 months' incarceration, which is within the advisory Guidelines' range of 41-51 months that applies in this case and to which the parties stipulated in their plea agreement. A 51-month custodial sentence is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the gravity of his crimes.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the Pre-Sentence Report ("PSR") (ECF 65) and the Statement of Offense incorporated into Miller's plea agreement, a joint session of Congress had convened at

approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 17-23.

3

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds, as depicted in Government's Exhibit 1, made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



**Exhibit 1[2]**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore

numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"

These fences were not actively manned, but members of the USCP were stationed nearby as well

as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather

against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing

this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1

as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach of

---

[2]  Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021,
credited to Twitter users @ne0ndistraction & @sansastark525.

the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than one minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Government's Exhibits 2A-D and 3A-D.



**Exhibit 2A**

**Exhibit 2B**

**Exhibit 2C**

**Exhibit 2D**[3]

---

[3] Exhibits 2A-D are stills from USCP security footage showing the progression of the crowd from the outer barricades (2A), to the first manned police barricade (2B), to engaging with USCP at the second manned police barricade (2C), and beginning to fill the Lower West Plaza (2D).



**Exhibit 3A**                    **Exhibit 3B**

**Exhibit 3C**                    **Exhibit 3D**[4]

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

---

[4] Exhibits 3A-D are stills from USCP security footage showing the breach of the West Plaza. The breach of the barricades (3A) was followed by the formation of a USCP officer wall (3B) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (3C).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (3D).

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Government's Exhibits 4A-C.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Exhibit 4A**



**Exhibit 4B**



**Exhibit 4C**[5]

---

[5] Exhibits 4A-C show the breakthroughs in the defensive line on both the left and right flanks (4A) caused the entire police line to collapse and individual officers were swallowed by the

10

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day, as seen in Government's Exhibit 5.

---

crowd (4B) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (4C).



**Exhibit 5[6]**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

---

[6] Architect of the Capitol, available at: https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer

Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing

14

as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at \*3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at \*7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at*

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous

weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers

and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol,

J. Brett Blanton, Statement before the House of Representatives Committee on House

Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect

of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.

Capitol Building.   They caused extensive, and in some instances, incalculable, losses. This

included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems

and photography equipment, broken furniture, damaged artwork, including statues and murals,

historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and

Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar

Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb.

24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   As set

forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, to

date requiring the expenditure of more than 2.7 million dollars in losses.

**B.        Defendant's Role in the January 6, 2021 Attack on the Capitol**

On January 6, 2021, Miller was in Washington D.C.   Once on restricted grounds of the U.S. Capitol, Miller encouraged rioters to get closer to the U.S. Capitol Building and threw a full beer can at law enforcement officers.   Once on the Lower West Terrace, Miller took several actions against the police guarding the entrance to the Capitol Building at the LWT tunnel.   There he urged other rioters to push against the police; threw batteries at police officers; and Miller ultimately released the contents of a fire extinguisher, a dangerous weapon when used as Miller did, directly onto law enforcement officers protecting the entry point into the heart of our democracy within the Lower West Terrace tunnel.

*Approach to the Capitol*

Miller, wearing a cowboy hat and Washington Capitals hockey jersey, urged rioters to come closer to the building, as depicted in Government's Exhibit 6[7] (a video submitted to the Court) and Exhibits 6A-D (stills from Exhibit 6).   While standing on a wall, he waved his arm in a "come this way" fashion at least 30 times and called out, "Come on!"



**Exhibit 6A**                                      **Exhibit 6B**

---

[7] Open-source video Titled, "My DC Experience - Capitol" found at
https://www.youtube.com/watch?v=tNl8-SKNrPA&t=276s.



**Exhibit 6C**                    **Exhibit 6D**

Also while within the restricted grounds of the Capitol, Miller, while draped in a

Confederate flag, threw a full beer can approximately 30 yards, in the direction of law

enforcement, as depicted in Government's Exhibit 7[8] (a video submitted to the Court) and

Exhibits 7A-D (stills from Exhibit 7).   From the video, it appears that when this object landed a

loud noise rang out, causing members of the crowd to gasp and crouch down.



**Exhibit 7A**                    **Exhibit7B**

---

[8]   Open-source video Titled, "My DC Experience - Capitol" found at
https://www.youtube.com/watch?v=tNl8-SKNrPA&t=276s.



**Exhibit 7C**                                    **Exhibit 7D**

In working his way closer to the Lower West Terrace, Miller, while draped in a distinctive yellow flag, which was recovered from his home, and working with others, helped moved a board up the Capitol structure. He then used a bike-rack style barrier as a ladder to scale the U.S. Capitol, as shown in Government's Exhibit 8[9] (a video submitted to the Court) and Exhibits 8A-C (stills from Exhibit 8).



**Exhibit 8A**                                    **Exhibit 8B**

---

[9] Open-source video found at https://archive.org/details/RtmsDNqrfyvMzceKF.



**Exhibit 8C**

### *Miller on the Lower West Terrace*

Miller was not deterred by the violence surrounding him; rather, he advanced to become part of it. He was on the Lower West Terrace by mid-afternoon on January 6, 2021, as seen in Government's Exhibits 9[10] and 10.

---

[10] Still from an open-source video that can be viewed at:
https://archive.org/download/qJkwSv4NDuuY7k9MB/qJkwSv4NDuuY7k9MB.mpeg4.



**Exhibit 9**



**Exhibit 10**

On the Lower West Terrace, rioters rocked back and forth chanting, "Heave! Ho!" against the law enforcement guarding the doors within the tunnel leading into the Capitol.   Miller faced away from the tunnel, waved his arm over and over, urged the crowd and appeared to say, "come on."   As seen in Government's Exhibit 11[11] (a video submitted to the Court) and Exhibits 11A-B (stills from Exhibit 11), Miller put up his fingers one at a time and yelled, "one, two, three,

---

[11] Open-source video titled, "FULL FOOTAGE: Patriots STORM U.S. Capitol" (4K60fps).

push!"  He did this at least four times and for approximately two minutes.



**Exhibit 11A**



**Exhibit 11B**

Miller also took advantage of his proximity to the tunnel by throwing objects, believed to

be batteries, towards the defensive line of law enforcement officers attempting to secure the Lower

West Terrace tunnel entrance to the U.S. Capitol, as seen in Government's Exhibit 12[12] (a video

---

[12] Open-Source video can be viewed at: https://www.youtube.com/watch?v=cRCEMN-lq_o&t=810.

submitted to the Court) and Exhibits 12A-C (stills from Exhibit 12).



**Exhibit 12A**



**Exhibit 12B**



**Exhibit 12C**

At approximately 4:55 p.m.—while rioters were assaulting law enforcement officers with bats, flagpoles, riot shields; screaming obscenities and vulgarities at officers; and attempting to force their way inside the Capitol—Miller unleashed the contents of a fire extinguisher directly into the Lower West Terrace tunnel at the law enforcement officers there.[13]   This assault is

---

[13] That same fire extinguisher is picked up seconds later by Defendant Robert Palmer (21-cr-328), who emptied the contents of the fire extinguisher on the officers and then hurled it at them.

depicted in Government's Exhibit 13[14] (a video submitted to the Court) and Exhibit 13A[15].



**Exhibit 13A**

    As evidenced in Government's Exhibit 14[16] (a video submitted to the Court) and Exhibits

14A-B (stills from Exhibit 14), at least a dozen law enforcement officers were in the Lower West

Terrace tunnel as the contents of the fire extinguisher discharged by Miller washed over them.

---

For his crimes, Defendant Palmer was sentenced to 63 months incarceration.
[14] Video obtained from the contents of defendant Jacob Lang's phone.
[15] Open-Source Getty Image.
[16] BWC from MPD Officer J. Park.



**Exhibit 14A**



**Exhibit 14B**

*Injuries*

The contents of a fire extinguisher are known to cause respiratory, skin, or eye irritation, and could cause serious toxicity if inhaled.[17] More than half a dozen officers who were in the

---

[17] https://www.poison.org/articles/fire-extinguisher-safety-184#:~:text=Proper%20use%20of%20fire%20extinguishers,and%20would%20require%20medi

26

Lower West Terrace tunnel when Miller deployed a fire extinguisher were interviewed; none could identify Miller specifically.   However, all reported "smoke" or an "unknown fog."   Most stated they needed to use water to cleanse the substance from their eyes; one said the "smoke" impaired their vision; one said it burned his skin.   A USCP officer provided photographs depicting the appearance of his helmet after the assault in the Lower West Terrace tunnel, as shown in Government's Exhibits 15A and 15B[18].



**Exhibit 15A**              **Exhibit 15B**

Miller's participation in this riot contributed to the rioters who also injured officers and destroyed property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6,

---

cal%20evaluation.

[18] Photos provided by U.S. Capitol Police Officer J. Collins

2021 Attach") *supra.*   Further, Miller's violent conduct served to incite and embolden other violent rioters around him.

### III.    THE CHARGES AND PLEA AGREEMENT

On November 10, 2021, a federal grand jury returned a superseding indictment charging Miller with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F); and Stepping, Climbing, Removing, or Injuring Property on the Capitol Grounds, in violation of 40 U.S.C. § 5104(d).

On February 9, 2022, Miller pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), and the lesser included of Count Three, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

Pursuant to the terms of his plea agreement, Miller engaged in a debrief with the U.S. Attorney's Office and the Federal Bureau of Investigation prior to his sentencing. During his interview, Miller expressed remorse for his actions on January 6, but said there were agitators in

the crowd, inferring a deflection of blame.

## IV.    STATUTORY PENALTIES

Miller now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, Miller faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding, and up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Assaulting, Resisting, or Impeding Certain Officers.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The final PSR includes one error.

The PSR does not include the three-level enhancement for the specific offense characteristic pursuant to U.S.S.G. §2J1.2(b)(2).   *See* PSR ¶¶ 40-49.   Miller's offense resulted in

substantial interference with the administration of justice, specifically, the proceeding before Congress, to wit: Congress's certification of the Electoral College vote; therefore, the three-level enhancement applies.   Miller acknowledged this in his plea agreement.   *See* Plea Agreement, at ECF 58.

The three-level increase applies where "the offense *resulted in* substantial interference with the administration of justice. U.S.S.G. § 2J1.2(b)(2) (emphasis added). The Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). The offenses that Miller committed on January 6 resulted in substantial interference with the administration of justice because it involved the unnecessary expenditure of governmental resources.

That commonsense view finds support in the case law. For example, district courts have relied on the phrase, "the unnecessary expenditure of substantial government or court resources," to apply subsection (b)(2)'s three-level enhancement to interference with non-judicial proceedings and to obstruction that led to the government's expenditure of resources. In *United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017), the Seventh Circuit affirmed the application of that enhancement after numerous federal agents "worked for several days around the clock" to bring a defendant's children back to the United States after the defendant violated an international parental kidnapping statute. In *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009), the district court applied the enhancement after defendants interfered with

OSHA investigations into a workplace accident.   In *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998), the district court applied the enhancement after a defendant withheld subpoenaed documents from a congressional subcommittee. The Eleventh Circuit recently cited affirmatively to another case in which it found Section 2J1.2(b)(2) applicable where the government was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the grand jury.as a result of the defendant's false grand jury testimony. *See United States v. Pegg*, 812, F. App'x 851, 860 (11th Cir. 2020) (citing *United States v. Johnson*, 485 F.3d 1264, 1271–72) (11th Cir. 2007)). *See also United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (affirming the application of the enhancement because significant "government" resources were invested to resolve the defendant's attempts at obstruction); *United States v. Tankersley*, 296 F.3d 620, 623–24 (7th Cir. 2002) (same); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (same); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same).

The events of January 6, 2021 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from the Architect of the Capitol, the Capitol Police, the House Chief Administrative Office, and the Senate Sergeant at Arms totaling at least $2,734,783.15 . Miller's offense—along with similar offenses committed by many others—without question "resulted in" the "unnecessary expenditure of substantial governmental resources": the deployment of hundreds of law enforcement officers, and ultimately National Guardsmen and Guardswomen, to defend and then clear the Capitol building and grounds of those—including Miller—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings. The repair and clean-up costs were similarly

extensive—and certainly "substantial." In short, the breach delayed the electoral certification by more than five hours, caused nearly three million dollars of damage to the Capitol and other losses, triggered an overwhelming police response, and required a massive security response up to and through the inauguration. *See Ali*, 864 F.3d at 574 (noting that involvement by various agencies working through the night amounted to substantial expenditure, notwithstanding the government's failure to supply cost estimates related to these expenses).

This reading of the specific offense characteristic at issue also finds support in § 1B1.3(a)(3), which includes as relevant conduct "all harm that resulted from" or "was the object of" the defendant's acts (or the acts of others engaged in jointly undertaken criminal activity). Here, Miller's actions meet both of those conditions.   Section 2J1.2(b)(2)'s substantial interference enhancement focuses on whether the end result—the obstruction itself—was substantial.   Here, it was.   Miller's actions on January 6, coupled with those of his fellow rioters, directly resulted in delaying the certification vote for several hours, in addition to the various expenditures detailed above required to address this obstruction.

This Probation Department has recommended the application of the specific offense characteristic related to the "administration of justice" in several other Capitol riot matters in which defendants were convicted of violating 18 U.S.C. § 1512, including *United States v. Hodgkins*, 21-cr-188-RDM; *United States v. Fairlamb*, 21-cr-120-RCL; *United States v. Chansley*, 21-cr-3-RCL; *United States v. Wilson*, 21-cr-345-RCL; and *United States v. Rubenacker*, 21-cr-193-1-BAH. The sentencing judges applied the specific offense characteristics related to the "administration of justice" in all those cases, with the exception of *Rubenacker*, who has not yet been sentenced.

Finally, Miller himself agreed that the three-level enhancement applies. See Plea

Agreement, at ECF 58.

*See* Plea Agreement at ¶¶ 5(A).[19]

The U.S. Probation Office calculated Miller's criminal history as category I, which is not disputed. *See* PSR ¶ 52. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 22, Miller's Guidelines imprisonment range is 41 to 51 months' imprisonment.  Miller's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of

---

[19] Based on the facts and circumstances of Miller's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 41-51 months is sufficient but not greater than necessary to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Miller's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Defendant Miller's crimes weigh heavily towards a significant term of incarceration. Upon approaching the Capitol, Miller both encouraged others

over a wall and hurled an object towards the building.   *See* Exhibits 6 and 6A-D.   Miller helped others to move a large board onto the Capitol and then used a barricade to scale a wall on the Capitol grounds.   *See* Exhibits 8 and 8A-C.   Once closer to the entrance to the Capitol, by calling out multiple times, "come on" and "one, two, three, push," for at least two minutes, Miller incited the mob to push in a collective fashion in unison against law enforcement officers protecting the Capitol.   *See* Exhibits 11 and 11A-B.   Miller threw what appear to be batteries at police officers in the tunnel.   See Exhibits 12 and 12A-C.   Completely undeterred by the medieval battle occurring before him, Miller unleashed the contents of a fire extinguisher directly onto police. *See* Exhibits 13, 13A, 14, and 14A-B.

Defendant Miller's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. His actions show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement.

The seriousness of this offense including the defendant's incitement of the mob violence and assault on multiple police officers, demands a lengthy sentence of imprisonment.

**B.  The History and Characteristics of the Defendant**

Miller's conduct on January 6, 2021 demonstrates a violent character and disrespect for law enforcement, despite his lack of prior criminal convictions.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[20]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Miller's criminal conduct, assaulting  law enforcement officers and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Miller entered the Capitol grounds, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

###### D.        The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

---

[20]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

domestic terrorism, which the breach of the Capitol certainly was.[21] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by this Court during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence   This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to deter Miller from future, similar criminal conduct   also

---

[21] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

weighs heavily in favor of a sentence at the top of the Guidelines ranges.   Although Miller has a criminal history category of I, his conduct on January 6, 2021 was egregious.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of

> potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Miller committed on January 6, 2021 are unprecedented.   Mechanical comparison to many Section 111(a)(1) cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to

other obstructive and assaultive conduct in other contexts.   January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.[22]

As of the date of this sentencing memorandum, several felony Capitol Riot defendants have been sentenced:

*United States v. Paul Hodgkins*, 21-cr-118-RDM. Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag. There, the United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months' imprisonment. Hodgkins was the first defendant to be sentenced for a violation of Section 1512(c)(2).   Unlike Miller, he took very early responsibility for his actions and he neither committed nor incited violence on January 6. The facts here are dramatically different and warrant a dramatically different sentence.

*United States v. Fairlamb*, 21-cr-120-RCL.   Fairlamb armed himself with a police baton and incited violence outside of the Capitol.   He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing a weapon. Fairlamb also assaulted a law enforcement officer.   There, the United States requested 44 months' imprisonment.   The Court imposed a 41-month sentence for violations of Sections 1512(c)(2) and 111(a).

*United States v. Languerand*, 21-cr-353-JDB.   Languerand threw multiple objects at the law enforcement officers guarding the Capitol in the Lower West Terrace tunnel, and afterwards bragged on social medial about his role in the riot.   There, the government recommended a sentence of 51 months' imprisonment.   The Court imposed a 44-month sentence for violations of Sections 111(a) and (b).

---

[22] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in an unwarranted sentencing disparity.

*United States v. Chansley*, 21-cr-0003-RCL.   Chansley has been called the "face of the insurrection" because his unique garb and makeup made him highly visible.   Chansely neither assaulted officers nor caused physical damage to the Capitol.   For going into the Senate chamber, writing a note that could easily be interpreted as threatening, and leading rioters in prayer, Chansely received a 41-month sentence of incarceration for his violation of Section 1512(c)(2).

*United States v. Thompson*, 21-cr-461-RCL.   The Court sentenced Thompson to 46 months' incarceration for fighting law enforcement officers in the Lower West Terrace tunnel.   Specifically, Thomson threw objects at officers and hit one on the hand with a metal baton causing a bruise. There, the United States recommended 48 months, in part based on Thompson's turning himself in and then cooperating with the government by providing information at multiple debrief meetings, prior to accepting a plea offer.

*United States v. Creek*, 21-cr-645-DLF.   The Court sentenced Creek to 27 months' incarceration after a guilty plea to a single count Section 111(a)(1).   Creek's conduct included shoving one police officer back several feet before striking that officer on the face shield portion of helmet and pushing a second police officer down then kicking him.

*United States v. Wilson*, 21-cr-345-RCL.   Wilson and Miller are closely situated.   Wilson was also on the Lower West Terrace on January 6.   There, he punched law enforcement officers, attempted to take their shields, and threw objects at them.   In that case, the United States recommended a sentence of 46-months incarceration.[23]   For violations of Sections 1512(c)(2) and 111(a), the Court sentenced Wilson to 51 months' imprisonment, the same sentence the government is seeking in the present case.

---

[23] The government credited Wilson with being the third Capitol rioter to enter a guilty plea to a felony charge.

*United States v. Palmer*, 21-cr-328-TSC.   Palmer is the most similarly situated to Miller. Palmer, like Miller, deployed the contents of a fire extinguisher directly into the Lower West Terrace tunnel onto law enforcement officers.   If fact, the very fire extinguisher Palmer picked up and deployed, was the same one Miller had just sprayed.   As demonstrated in Exhibits 13 and 14, just after Miller deployed the fire extinguisher against police, Palmer picked it up and threw it at the officers seconds later.   Like Palmer, Miller also threw objects into the tunnel at officers. Unlike Palmer, Miller also encouraged others over a wall and urged a huge mob of rioters to rock in unison pushing against officers guarding the Capitol while chanting "Heave Ho."   For assaulting law enforcement officers with a dangerous or deadly weapon (the same fire extinguisher Miller used moments earlier), Palmer was sentenced to 63 months' imprisonment for violating Sections 111(a) and (b).[24]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

[24] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1, because of his post-plea conduct.   Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[25] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Miller must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Miller played in the riot on January 6.[26] Plea Agreement at

---

[25] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[26] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

¶ 12.    As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.*   Miller's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 125.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 51 months, which is a high-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY*: /s/Jacqueline Schesnol*
JACQUELINE SCHESNOL
AZ Bar No. 016742
Trial Attorney
Capitol Riot Detailee
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004-4449
(602) 514-7500
jacqueline.schesnol@usdoj.gov