UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, | : |
| | : |
| v. | : |
| | : Crim. No. 21-00075(RDM) |
| MATTHEW RYAN MILLER, | : |
| | : |
| *Defendant.* | : |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Matthew Miller ("Matthew"), by and through undersigned counsel respectfully submits this memorandum in aid of sentencing. Matthew will come before the Court on May 23, 2022, for sentencing after having accepted responsibility for his actions and pleading guilty to Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and the lesser included offense to Count 3, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1).

For the reasons stated below, Matthew respectfully requests that the Court sentence him to a term of incarceration of one year and a day.

### BACKGROUND

The charges to which Matthew has pled guilty arise from the events of a dark day in American history. After Donald Trump lost the 2020 Presidential election, he unleashed a torrent of lies about a "stolen election" to his followers. These lies culminated in a "Stop the Steal" rally on the Ellipse on January 6, 2021. Although Matthew himself did not attend the rally, he was in the District of Columbia that day because he thought it would be "cool" to be part of history.

At the rally, Trump vented his lies about the election and directed his followers to march to the Capitol.  As the crowds marched, Matthew joined in without any plan or idea about what was to happen.  Matthew then made the fateful decision to march up to the Capitol grounds, where he was swept up in the crowd's wave as it sought to enter the Capitol building at the Lower West Terrace tunnel.  As rioters pushed towards the tunnel, Matthew and others encouraged them.  In response to the assault, police officers holding back the rioters utilized flash bang grenades, pepper spray and other munitions.  Matthew, in the thick of the crowd, responded by setting off a fire extinguisher at the police and throwing batteries.  Fortunately, he did not injure anyone, but the damage was done.  Realizing what he had done was completely wrong – and illegal – Matthew dropped the fire extinguisher, which was picked up by another rioter who discharged it again and eventually hurled it at police officers.

Matthew is a young man who made a terrible decision on January 6, 2021.  He recognizes that his personal conduct and participation in the riot were not born of a rational decision, but rather were fueled by alcohol and marijuana abuse.  He fully accepts responsibility for what he has done and is not making excuses.  Rather, he wants the Court to know why he acted as he did.

The government's requested sentence of 51 months in prison is greater than necessary to punish him for his crime.  A sentence of one year and a day is sufficient, will allow Matthew to address his substance abuse problems and will instill in him a respect for the law.

## OBJECTIONS TO THE PRESENTENCE REPORT

Matthew and counsel have reviewed the Presentence Investigation Report ("PSR") and addendum prepared by U.S. Probation Officer Kelli Willet and noted no objections to the initial PSR.  The final PSR includes "offense behavior not part of the relevant conduct"

and describes Matthews alleged affiliation with the Proud Boys. According to the final PSR, "The government has no evidence suggesting that the defendant was acting in conjunction with the Proud Boys group on January 6th." Matthew objects to the inclusion of this information in the PSR as not relevant to any sentencing determination because his alleged affiliation had nothing to do with his conduct on January 6.

## STATUTORY AND GUIDELINE ANALYSIS

### Statutory Penalties

Count 2 carries a maximum term of imprisonment of 20 years, a maximum $250,000 fine and a maximum term of supervised release of 3 years.

Count 3 carries a maximum term of imprisonment of 8 years, a maximum of $250,000 fine and a maximum term of supervised release of 3 years.

### Guidelines Calculation

The final PSR calculated the sentencing guidelines as follows:

| | | |
|---|---|---|
| a) | Base offense level – U.S.S.G. § 2J1.2 | 14 |
| b) | Specific offense characteristic – U.S.S.G. § 2J1.2(b)(1)(B) | +8 |
| c) | Acceptance of responsibility – U.S.S.G. § 3E1.1(a) & 3E1.1(b) | -3 |
| | Total offense level | 19 |

With a criminal history category of I, the PSR calculated the guideline sentencing range as 30 – 37 months. Matthew does not object to this calculation.

## SECTION 3553(a) FACTORS

18 U.S.C. § 3553(a) mandates that a court "impose a sentence sufficient, but not greater than necessary, to comply with" the sentencing goals described in subparagraph 2. In

3

imposing a sentence that is sufficient, but not greater than necessary, the court should look to the statutory factors listed under Section 3553. These factors include:

1. **Nature and circumstances of the offense and history and characteristics of the defendant**

Matthew admits that the events of January 6, 2021, were "unparalleled in American history." Gov. Sent. Mem. at 33. While he acted as part of a mob that besieged the Capitol, the Supreme Court has long held that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall v. United States*, 552 U.S. 38, 52 (2007) *quoting Koon v. United States*, 518 U.S. 81, 113 (1996). Here, the Court must consider Matthew Miller's individual conduct, rather than the mob's as a whole.

*Matthew's History and Characteristics*

Matthew is the second son of Michelle and Kenneth Miller, who instilled in him traditional values such as treating others with respect and giving to those in need. These teachings guided Matthew throughout his formative years and into young adulthood. Matthew is universally considered by family and friends to be a good person, hardworking and always willing to lend a hand to those in need. He had never been in trouble with the law prior to the instant conduct.

Matthew lost his job with Glenelg Construction because of his conduct on January 6, 2021. However, as soon as he was released to home confinement in February 2021, Matthew obtained another job with Maple Valley Landscaping, where he worked until he was ordered to self-surrender upon his guilty plea. Dean Kues, President of Maple Valley Landscaping, has indicated that Matthew has a job waiting for him upon release.

4

Matthew's involvement in the riot of January 6 was not pre-meditated. At the time of the riot he had begun to listen to the stream of lies about a stolen election coming from right-wing media and from Trump himself. He initially intended to attend the "Stop the Steal" rally because he thought it would be "cool" to be part of history. He never set out to assault anyone or to participate in the riot. Matthew's involvement in the events that led to his conviction can be explained by his abuse of alcohol and marijuana. He was both drunk and high when he fell in with the mob marching towards the Capitol and when he discharged the fire extinguisher at the officers in the Lower West Terrace Tunnel. In fact, Matthew was seen carrying a case of beer that he mostly consumed prior to his participation:



Although Matthew was 21 years old at the time of the riot – legally an adult – studies have shown that the pre-frontal cortex of the brain is not fully developed until the age of 25:

> It is well established that the brain undergoes a "rewiring" process that is not complete until approximately 25 years of age. This discovery has enhanced our basic understanding regarding adolescent brain maturation and it has provided support for behaviors experienced in late adolescence and early adulthood. Several investigators consider the age span 10–24 years as adolescence, which can be further divided into substages specific to physical, cognitive, and social–emotional development. …
>
> Recently, investigators have studied various aspects of the maturation process of the prefrontal cortex of adolescents. The prefrontal cortex offers an individual the capacity to exercise good judgment when presented with difficult life situations. The prefrontal cortex, the part of the frontal lobes lying just behind the forehead, is responsible for cognitive analysis, abstract thought, and the moderation of correct behavior in social situations. The prefrontal cortex acquires information from all of the senses and orchestrates thoughts and actions in order to achieve specific goals.
>
> The prefrontal cortex is one of the last regions of the brain to reach maturation, which explains why some adolescents exhibit behavioral immaturity. There are several executive functions of the human prefrontal cortex that remain under construction during adolescence …. The fact that brain development is not complete until near the age of 25 years refers specifically to the development of the prefrontal cortex.

Maturation of the Adolescent Brain, M. Arain et al., found at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/ . *See also* Tirza A. Mullin, *Eighteen Is Not A Magic Number: Why the Eighth Amendment Requires Protection for Youth Aged Eighteen to Twenty-Five*, 53 U. Mich. J.L. Reform 807, 812 (2020) ("The prefrontal cortex is essential for both impulse control and decision-making in complex or high stress situations and '[t]he fact remains that young people between the ages of eighteen and twenty-five do not have fully-developed capacity to control impulses and make rational choices.'" (quoting David Pimentel, *The Widening Maturity Gap: Trying and Punishing Juveniles As Adults in an Era of Extended Adolescence*, 46 Tex. Tech. L. Rev. 71, 84 (2013)).

This late development of the pre-frontal cortex can explain in part, but not excuse, why Matthew may have made the choices he did on January 6. His lack of maturity, along with his alcohol and marijuana abuse impaired his judgment and led him to where he is today. Nevertheless, since his arrest in this case, Matthew has done nothing but try to make amends for his actions. He has asked forgiveness from his family; he did everything asked of him while on home detention; and he asks forgiveness from the Court and the Nation.

The friends and family members who have written to the Court in support of Matthew almost unanimously note that he is a good person who cares about others and that he is genuinely remorseful for his actions:

- Kenneth Miller, Matthew's dad, describes him as "a great son and a fine young man with a promising future" and who learned to "treat everyone with respect and dignity." Mr. Miller states that Matthew "deeply regrets his action" on January 6, 2021 and that Matthew's actions have been "hugely stressful for Matthew and his extended family." Due to his failing health, Mr. Miller fears not seeing Matthew again if he is incarcerated for a long period of time. Exh. 1.1.

- Michelle Miller, Matthew's mom, describes him as a "generous, heartwarming, and sincere individual who is a benefit to our family and community." She notes that Matthew "has been an incredibly hard and dedicated worker all his life" and "has consistently been employed since the age of 15 years old." She further describes how Matthew worked and focused on bettering himself while on pretrial release and how he has spent the last three months in custody "reflecting and taking accountability for his actions on that day." Exh. 1.2

- Michael Miller, Matthew's brother, describes how when he "first learned of his actions that day my heart dropped. I was shocked, worried, and deeply saddened. His behavior painted a complete opposite representation of who he is. In our entire time, even back to growing up, I have never seen Matthew become physical with another being. He avoids conflict, and if it does present itself, he does everything in his power to defuse the situation." Michael further describes how he and Matthew have spoken about Matthew's remorse for his conduct: "We have spent a considerable amount of time together during the past year. With that, we have had many deep conversations as I am someone he will open up to. He has conveyed great remorse, embarrassment, and a definitive willingness to take responsibility. He always asked, "How can I make this right? … He recognizes his actions contributed to a dark day in American history which he is ashamed to be a part of." Exh. 1.3.

- Sonja Vozniak, Matthew's aunt, states that she knows that "Matthew is also sad that he disappointed so many family and friends that depended on him. He regrets his actions on January 6, 2021. Unfortunately, he was not aware of the gravity of his actions. However, now that he does, he is ready to take full responsibility and take decisive steps to endure he never conducts himself that way again." She further explains how Matthew is a caregiver for his elderly grandmother and always lends a helping hand. Exh. 1.4.

- Nancy,[1] a family friend, describes how she sees the same qualities in Matthew as the "best and brightest" that she has mentored in the past. She notes how Matthew has been a good son and is always willing to help others. She describes how Matthew is a "young man with a bright future. With guidance from strong role models and mentors (which I

---

[1] Nancy has requested that certain identifying information be redacted. An unredacted copy will be provided to the Court and the government.

and others will happily provide) he can, and will become a highly productive member of society." Nancy also notes that Matthew is "highly remorseful for his actions on" January 6. Exh. 1.5.

- Luke Harris, Matthew's best friend, knows him as a person who "has always been respectful of authority." He notes that Matthew was "admired for always working hard and known for thinking outside of the box to fix problems." Exh. 1.6.

- Donna Vozniak, Matthew's grandmother, notes how he has cared for her as her health declined. She states that Matthew is a "very understanding and caring person who loves to help others" and how he "fully understands the seriousness of his actions and has taken steps to ensure that he does not make the same mistake again." Exh. 1.7.

- Julianne Wagoner, Matthew's girlfriend, states that he "deeply regrets his actions on January 6 and would do anything to erase this day from his life. … He knows what he did was wrong…." Exh. 1.8.

- Michael Harris, Matthew's former employer, states that Matthew "always contributed to a positive work environment. He brought an optimistic attitude to difficult situations, encouraged and empathized with stressed-out employees, was selfless with his time and his money, and was always offering to help. Matt was conscientious and diligent in performing his duties. I could rely on Matt to be on-time, to complete projects correctly, and to tell the truth." Although Mr. Harris terminated Matthew's employment as a result of his conduct on January 6, he feels that Matthew "has immense potential for future success at work and in the community. … The allegations and the media depictions of Matt completely contradict all my experiences with him." Exh. 1.9.

- Dean Kues, Matthew's former employer, describes him as someone who was very honest and upfront about his legal situation and as "someone who was willing and eager to learn any part of the job." Mr. Kues notes how Matthew's employment has "been very positive for our company. Matt has expressed on many occasions how the legal situation he is in has had a negative impact on his life and how he has a great deal of remorse for his decisions in this matter." Matthew was employed with Mr. Kues' company during the time he was on pretrial release and prior to his incarceration after his guilty plea. Exh. 1.10.

In short, Matthew, an otherwise law-abiding citizen, made a tremendous mistake by behaving as he did on January 6, 2021. His conduct has caused him to lose his job and his reputation, has humiliated him in front of his family, friends and the public and caused untold grief to his family about his incarceration and impending sentencing. More devastating for Matthew, his conduct will cause him to be away from the family he loves for whatever period of incarceration the Court imposes. He can begin to make amends for his actions as well as pay his debt to society, but he can never forgive himself for causing great pain and suffering to his victims and his family.

Matthew recognizes that his conduct constituted a serious crime and that he has to pay for that conduct. However, the sentenced recommended by the government would result in a sentence that is far greater than necessary to carry out the purposes of § 3553(a).

**2.    Seriousness of the offense, respect for the law, just punishment**

The offense of conviction is undoubtedly serious. However, Matthew has clearly demonstrated his respect for the law and the legal process by agreeing to plead guilty, accepting responsibility, foregoing a costly trial and assisting the government with its ongoing

investigation as required by the plea agreement. He has demonstrated his capacity and willingness to follow the law and the Court's conditions by being fully compliant with his release conditions.

### 3. Deterrence to criminal conduct and protection from further crimes

Matthew has never been in legal trouble before. There is nothing in his past or even in the current situation that would indicate that he will break the law again or that society has to be protected from him for an extended period of time. His conduct on January 6 was an aberration from an otherwise law-abiding life as attested to by his friends and family. A federal felony conviction will forever follow him and affect his future when he tries to go to school or get a job. To a young man like Matthew, many avenues of advancement have already been cut off because of his conviction. He understands that his actions have consequences and, as he sits in jail awaiting sentencing, is reminded of that every day. A lengthy prison sentence will not serve to deter him from future criminal conduct; he has been deterred by the consequences he has already faced. As noted in the PSR, "there is no perceived benefit to either defendant or to society to be derived from an extensively punitive sentence." Doc. 66 at 3.

### 4. Need for treatment and training

Matthew has a substance abuse problem involving marijuana and alcohol. His problem evidenced itself on January 6 when Matthew consumed marijuana and most of a case of beer. His judgment was compromised and he unfortunately acted as he did. Substance abuse treatment and counseling will serve him better than a long prison sentence.

### 5. Need to avoid sentencing disparities

According to the government, there are several similarly situated individual defendants January 6 cases:

11

- *United States v. Thompson*, 21-CR-00461(RCL) – according to the government's sentencing memorandum in that case, "Thompson joined dozens of other rioters in the Lower West Terrace tunnel who were actively assaulting MPD and Capitol Police officers with their hands and all manner of weapons, including their poles, batons, full bottles, and chemical spray. For approximately the next 13 minutes, between approximately 2:52 PM and 3:05 PM, Thompson was in the tunnel zone and was actively assisting, aiding, and abetting the mob that was assaulting officers and trying to break through the police line to gain access to the Capitol Building." *See generally* Doc. 30, 21-CR-00461(RCL). Thompson was sentenced to 48 months in prison. Unlike Thompson, Matthew did not enter the Lower West Terrace Tunnel or engage in hand-to-hand combat with the police.
- *United States v. Creek*, 21-CR-00645(DLF) – the government asserted that Creek, a former Marine, went to the "Stop the Steal" rally prepared with a first aid kit, mace, a knife and binoculars. "Creek and the mob pushed up against the bike-rack barrier backed by a thin line of police officers. The barrier had been reconstituted by police after the first breach of the West Front that occurred over an hour earlier. The mob, including Creek, pushed through the reconstituted barrier, breaking the line of bike-rack fencing and the police officers behind it. Creek ran through the front of the crowd, grabbing a Metropolitan Police Department (MPD) Officer (hereinafter referred to as 'Officer J.C.M.') and driving him backward forcefully several feet through the West Plaza. After letting go of Officer J.C.M., Creek hit him in the face shield of his helmet. Creek then pointed aggressively to his Marine Corps cap, as if to emphasize, 'I'm a Marine!'" Furthermore, "Creek then made a beeline for a U.S. Capitol Police (USCP) officer

12

(hereinafter referred to as 'Officer R.S.E.') who was attempting to protect himself behind a bike rack barrier and a police shield. Creek went around the bike rack barrier, gave Officer R.S.E. a hard shove in the shoulders, and then kicked him, causing Officer R.S.E. to fall backward to the ground. Officer R.S.E. tried to get up when another rioter pushed him back down to the ground." During an interview with the FBI, Creek was asked whether he regretted his conduct, "Creek replied, '50/50.' Creek stated that he regretted having to talk to FBI agents and never imagined that he'd be in trouble with the FBI. He also complained about having to go through "the whole nine yards" during airport screening. Creek said that he "lost his country" on January 6." *See generally* Doc. 48, 21-CR-00645(DLF). Creek was sentenced to 27 months in prison. Unlike Creek, Matthew did not engage the police in hand-to-hand combat with the police. Furthermore, he has not complained about the consequences of his action nor been ambivalent about taking responsibility as Creek did.

- *United States v. Wilson*, 21-CR-00345(RCL) – according to the government, "Wilson made his way to the U.S. Capitol and attempted to gain entrance into the building through the doors at the Lower West Terrace. Dozens of officers in riot gear were protecting the entrance to the Capitol building, and upon seeing the mob approaching, officers attempted to close and lock the doors. Before they could do so, however, Wilson lunged toward the door and prevented it from closing, allowing other rioters help pry it open and engage officers in the attack …. Soon thereafter, dozens of individuals, including Wilson, physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields. Officers responded, in part, by spraying the crowd of rioters with chemical irritant in an effort to force them to leave the

Lower West Terrace area. … Undeterred, Wilson picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at the officers with it, striking A.G., as charged in Count 3 of the Indictment. After assaulting A.G. with the thin PVC pipe, Wilson threw it into the crowd of officers, striking W.B.  Next, another rioter yelled, 'Send the shield back, send the shield back' and 'Take the goddamn shield,' at which point Wilson, along with other rioters, pushed P.N. to the ground and attempted to take his riot shield." *See generally* Doc. 29, 21-CR-00345(RCL).  Wilson was sentenced to 51 months in prison.  Again, unlike Wilson, Matthew did not personally physically engage officers.

- *United States v. Palmer*, 21-CR-00328(TSC) – According to the government, "After watching other rioters repeatedly assaulting the officers defending the Lower West Terrace entrance to the Capitol – a scene that horrified the rest of the world – Palmer chose to join in. Palmer made his way to the front line of the rioters and proceeded to attack the officers. Palmer first threw a wooden plank at the officers. He then sprayed the contents of a fire extinguisher at the officers, and when it was empty, hurled it at the officers. Palmer then rooted around for additional materials with which to assault the police, including throwing the fire extinguisher a second time. At this time, after his assaults had occurred, Palmer was pepper sprayed by law enforcement.  But the pepper spray only deterred Palmer for a short while. A few minutes later, on the West Plaza, Palmer assaulted another group of law enforcement officers with a 4-5 foot pole. As he threw the pole like a spear at the officers, one of them fired a non-lethal projectile at Palmer, hitting him in the abdomen. Palmer retreated and lay on the ground for a few minutes. When he got up, Palmer showed off his injury to the crowd, shouting falsely

that he had been shot merely for yelling at the police, when in fact he had provoked the injury by his own assault. Thereafter, in statements to a reporter, Palmer admitted that his goal was to subvert a democratic election and that he hoped for military intervention to overturn the election in order to keep the losing candidate in power." *See generally* Doc. 30, 21-CR-00328(TSC).  Palmer was sentenced to 63 months in prison.  Again, unlike Palmer, Matthew did not engage in hand-to-hand combat against police officers.

7. **Need to provide restitution**

Matthew has agreed to pay restitution of $2.000.00 as part of the plea agreement.

**OTHER FACTORS**

**Consideration of credit for time served**

Matthew respectfully urges the Court to give him full credit for the time he has been incarcerated from January 25, 2021 to February 19, 2021 and from February 23, 2022 to the present.  Title 18 U.S.C. § 3585(b) states that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) *as a result of the offense for which the sentence was imposed*; …" Therefore, Matthew respectfully requests that the Court apply credit for the entire time that he has been in custody.

**Recommendation for Bureau of Prisons designation**

Matthew respectfully requests that the Court recommend to the Bureau of Prisons that he be designated to FCI Cumberland or FCI Fort Dix so that he can be as close as possible to his family and have their support that will be crucial to his reintegration into society.

## CONCLUSION

Although Matthew cannot turn back the clock, he has demonstrated that he is a person of good character and demeanor who made a terrible mistake that was an aberration to an otherwise law-abiding life, and who has clearly begun to make amends for his conduct.

Matthew respectfully requests that after considering the § 3553(a) factors, the Court impose a sentence of 12 months and 1 day. In light of the relevant case law and pursuant to 18 U.S.C. § 3553(a) such a sentence is reasonable and sufficient.

**Dated**: Washington, DC
      May 16, 2022               Respectfully submitted,

                                    **BALAREZO LAW**

                                    /s/
                      By: _____
                            A. Eduardo Balarezo, Esq.
                            D.C. Bar # 462659
                            400 Seventh Street, NW
                            Suite 306
                            Washington, DC  20004
                            Tel: (202) 639-0999
                            Fax: (202) 639-0899
                            E-mail: aeb@balarezolaw.com

                            *Counsel for Defendant Matthew Miller*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 16[h] day of May 2022, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via ECF to the Parties in this matter.

                                      /s/
                            _____
                            A. Eduardo Balarezo